**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANGELA MCMILLER, individually and on behalf of similarly situated individuals, | ) ) ) ) | |
| *Plaintiff*, | ) ) | No. |
| v. | ) ) ) | |
| THE GOODYEAR TIRE & RUBBER COMPANY; CONTINENTAL AKTIENGESELLSCHAFT; CONTINENTAL TIRE THE AMERICAS, LLC; COMPAGNIE GÉNÉRALE DES ÉTABLISSEMENTS; MICHELIN NORTH AMERICA, INC.; NOKIAN TYRES PLC; NOKIAN TYRES INC.; NOKIAN TYRES U.S. OPERATIONS LLC; PIRELLI & C. S.P.A.; PIRELLI TIRE LLC; BRIDGESTONE CORPORATION; BRIDGESTONE AMERICAS, INC.; AND DOES 1-100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) ) | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff, Angela McMiller, brings this Class Action Complaint against Defendants, The

Goodyear Tire & Rubber Company; Continental Aktiengesellschaft; Continental Tire the

Americas, LLC; Compagnie Générale Des Établissements; Michelin North America, Inc.; Nokian

Tyres PLC; Nokian Tyres Inc.; Nokian Tyres U.S. Operations LLC; Pirelli & C. S.p.A.; Pirelli

Tire LLC; Bridgestone Corporation; and Bridgestone Americas, Inc. (collectively, "Defendants")

seeking injunctive relief under the Sherman Antitrust Act, 15 U.S.C. § 1, and the Clayton Act, 15

U.S.C. §§ 15, 26, and/or damages and restitution under state antitrust laws. Plaintiff alleges as

follows based on personal knowledge as to herself and her own acts and experiences and as to all other matters, on information and belief, including an investigation by her attorneys.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Defendants for violations of state and federal antitrust laws stemming from a conspiracy amongst the world's largest tire manufacturers to unlawfully fix, raise, maintain, and/or stabilize the prices of new replacement tires for passenger cars, vans, trucks, and buses ("Class Tires") sold in the United States.

2.      Plaintiff alleges that Defendants engaged in a conspiracy to restrain trade by participating in an agreement or understanding to raise and maintain prices for Class Tires at artificially high levels in the United States. As a direct result of Defendants' actions, Plaintiff and members of the Classes (defined below) paid artificially higher prices for tires and thus suffered antitrust injury.

3.      In 2023, the replacement market for the United States was valued at approximately $57 billion.

4.      On January 30, 2024, the European Commission ("EC"), in collaboration with national competition authorities from European Union ("EU") Member States, carried out unannounced inspections of the premises of several tire companies, including a number of the Defendants.[1] The statement issued by the EC expressed concerns that "the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices."[2] Specifically, the EC stated that the inspections concerned new replacement tires for passenger cars, vans, trucks, and busses sold in the European Economic Area and possible price coordination

---

[1] https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561
[2] *Id.*

between Defendants.[3] The price coordination was believed to have occurred at least in part via public communications.[4]

5.    Evidence of an unlawful agreement to fix the prices of Class Tires includes unprecedented and frequent parallel price increase announcements and public signaling, which would be against the economic self-interest of individual tire manufacturers in the absence of an agreement to fix prices.

6.    The market for Class Tires is also highly susceptible to collusion because it is highly concentrated and dominated by a handful of companies, there are significant barriers to entry for new tire manufacturers, demand for Class Tires is inelastic, common membership in trade associations provides Defendants the opportunity to exchange competitive information, and the tire industry has a history of antitrust violations.

7.    Accordingly, Plaintiff brings this class action on her own behalf and on behalf of two putative classes seeking legal and equitable remedies for Defendants' antitrust violations.

## JURISDICTION AND VENUE

8.    This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff's and the putative class members' claims arise in part under the federal antitrust laws invoked herein, including the Sherman Antitrust Act and Clayton Act, 15 U.S.C. § 1, 15, 26. This Court has jurisdiction over Plaintiff's and the putative class members' other claims pursuant to 28 U.S.C. § 1367, because they are so related to the federal antitrust claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States.

9.    This Court also has federal subject matter jurisdiction over this matter pursuant to

---

[3] *Id.*
[4] *Id.*

the Class Action Fairness Act, 28 U.S.C. § 1332(d) *et seq*., because this case is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are greater than 100 putative class members; minimal diversity is satisfied; and none of the exceptions under subsection 1332(d) apply.

10.     This Court has personal jurisdiction over each Defendant because each Defendant or its subsidiary: (a) transacted business throughout the United States, including in this District; (b) sold, shipped, and/or delivered substantial quantities of Class Tires throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was intended to and did have the direct, foreseeable effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States.

11.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391, because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

12.     Plaintiff, Angela McMiller, is a natural person and citizen of Illinois, who purchased Goodyear tires from Pep Boys Autos Service & Tires in 2023.

A.      **Goodyear Defendant**

13.      The Goodyear Tire & Rubber Company ("Goodyear") is an Ohio corporation with its headquarters in Akron, Ohio. Goodyear is one of the world's leading tire companies and has a significant presence both in the U.S. and globally. It acquired Cooper Tire & Rubber Company in 2021 for $2.5 billion. Goodyear manufactures and sells Class Tires under the brands, including but not limited to Goodyear, Cooper, Dunlop, Kelly, Debica, Sava, Fulda, Mastercraft, and Roadmaster. During the relevant time period, Goodyear manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

B.      **Continental Defendants**

14.      Defendant Continental Aktiengesellschaft ("Continental AG") is a German company with its principal place of business in Hanover, Germany. During the relevant time period, Continental manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

15.      Defendant Continental Tire the Americas, LLC ("Continental US") is incorporated in Ohio with its headquarters in Fort Mill, South Carolina, and oversees various activities related to tire manufacturing, sales, and distribution in the United States. Continental US is a wholly owned subsidiary of Continental AG. During the relevant time period, Continental US manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

16.      Continental US and Continental AG, collectively, are referred to herein as "Continental" or the "Continental Defendants."

### C. Michelin Defendants

17.    Defendant Compagnie Générale des Établissements ("Michelin") is a French corporation with its primary place of business in Clermont-Ferrand, which is in the Auvergne region of France. During the relevant time period, Michelin manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

18.    Defendant Michelin North America Inc. ("Michelin America") is a New York corporation headquartered in Greenville, South Carolina. During the relevant time period, Michelin America manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

19.    Michelin America is a wholly owned subsidiary of Michelin. Michelin and Michelin America, collectively, are referred to herein as the "Michelin Defendants."

### D. Nokian Defendants

20.    Defendant Nokian Tyres PLC ("Nokian") is incorporated and headquartered in Nokia, Finland. During the relevant time period, Nokian manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

21.    Defendant Nokian Tyres Inc. is a corporation organized under the laws of the State of Delaware. It is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres PLC. During the relevant time period, Nokian Tyres Inc. manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

22.    Defendant Nokian Tyres U.S. Operation LLC ("Nokian U.S.") is a limited liability

company with its principal place of business in Dayton, Tennessee. It is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres PLC.

23.     At times, Nokian, Nokian Tyres Inc., and Nokian U.S., collectively, are referred to herein as "Nokian" or the "Nokian Defendants."

### E.     Pirelli Defendants

24.     Defendant Pirelli & C. S.p.A. ("Pirelli") is headquartered in Milan, Italy. During the relevant time period, Pirelli manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

25.     Defendant Pirelli Tire LLC ("PTL") is a limited liability company organized in Delaware with its principal place of business in Rome, Georgia. PTL is a wholly owned subsidiary of Pirelli. During the relevant time period, PTL manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

26.     PTL and Pirelli, collectively, are referred to herein as "Pirelli" or the "Pirelli Defendants."

### F.     Bridgestone Defendants

27.     Defendant Bridgestone Corporation ("Bridgestone") is a Japanese corporation with its principal place of business in Tokyo, Japan. Bridgestone is the world's largest tire company. During the relevant time period, Bridgestone manufactured and sold Class Tires globally, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries.

28.     Defendant Bridgestone Americas, Inc. ("BA") is responsible for the operations of Bridgestone in the Americas. BA is a wholly owned subsidiary of Bridgestone. BA is incorporated in Nevada with its principal place of business in Nashville, Tennessee, and oversees a wide range

of activities, including tire production, sales, and other automotive services. During the relevant time period, BA manufactured and sold Class Tires in the United States, both directly and through its predecessors, affiliates and/or subsidiaries.

29.     BA and Bridgestone, collectively, are referred to herein as "Bridgestone" or the "Bridgestone Defendants."

### G.     Co-Conspirators

30.     In addition to the named Defendants, other entities and individuals participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, these include Defendants' board of directors, officers, employees, or agents.

31.     Each of Defendants' agents operated under the authority and apparent authority of its principals.

32.     Each Defendant through its subsidiaries, affiliates, and agents operated as a single unified entity.

33.     Various persons and/or companies not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

34.     Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not those co-conspirators are named as Defendants in this Complaint.

### FACTUAL ALLEGATIONS

### A.     The Replacement Tire Market.

35.     The Defendants manufacture and sell original equipment manufacturer tires ("OEM Tires") and replacement tires in the United States.

36.     OEM Tires are specified by the vehicle manufacturer and fitted to new vehicles. Vehicle manufacturers work with tire manufacturers to select tires that fulfill various performance standards for new model vehicles.

37.     By contrast, replacement tires are purchased by consumers to replace worn out or damaged OEM Tires or if the vehicle owner desires different performance traits, such as better traction, fuel efficiency, or durability. Replacement tires can be the same brand and model as the OEM Tires or a completely different brand and type, allowing for preferences based on driving conditions, performance, and budget.

38.     Replacement tires are manufactured using many different materials, including natural rubber to resist tears, synthetic rubber polymers to improve traction and maintain air pressure, steel wire and textile cord for stability, and a soot-like filler called carbon black to reinforce the rubber.[5] Synthetic rubber and carbon black, which together make up roughly half the weight of a car tire, are made from petroleum.[6]

39.     Defendants manufacture and sell replacement tires directly to various types of customers, including tire retail chains and dealerships, automobile manufacturers, commercial fleet operators (businesses that operate large fleets of vehicles, such as logistics companies, bus lines, and rental car companies), government and public sector entities, wholesalers and distributors, online retailers, and automotive service and repair shops.

**B.     The Replacement Tire Market Is Susceptible to Collusion.**

*i.     Barriers to Entry*

40.     There are high barriers to entry for any new firm seeking to enter the replacement tire market. Such high barriers prevent the threat of new entrants potentially undercutting a

---

[5] https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices
[6] *Id.*

collusive agreement to raise prices. Any new entrant into the market would face expensive and lengthy start-up costs, including millions of dollars associated with research and development, manufacturing plants, equipment, energy, and transportation.

41.     Defendants have established strong brand reputations over the course of many years. Any new market entrant would also need to invest significant resources into marketing and quality assurance to compete against these well-known brands.

42.     The tire manufacturing process is capital-intensive, requiring substantial investment into machinery, technology, and raw materials. Developing Class Tires that meet safety, performance, and environmental standards also involves considerable research and development expenses.

43.     Defendants have extensive distribution networks and relationships with retailers, auto manufacturers, and service centers. Any new entrant would need to build such networks and relationships from scratch or secure partnerships, without the benefit of an established reputation.

44.     The tire industry is subject to strict regulations regarding safety, environmental impact, and performance standards. Complying with these regulations would require any new entrant to spend additional resources on testing and compliance.

45.     Defendants benefit from economies of scale that allow them to manufacture Class Tires efficiently. Any potential new entrant with lower production volumes would find it difficult to compete on price and profitability.

    ii.      *Inelasticity of Demand*

44.     Price elasticity of demand is a measure of the change in demand for a product in relation to any price change. Demand is inelastic when an increase in price does not cause lower demand. Such inelastic demand facilitates collusion because it allows conspirators to raise prices

without fear that purchasers will substitute cheaper alternatives.

45.     During the relevant time period, demand for Class Tires was, and continues to be, inelastic because Class Tires are essential for vehicle operation, making demand for them relatively insensitive to price changes. Consumers purchase Class Tires even if prices increase because tires are necessary for the operation, safety, and vehicle maintenance.

46.     Most consumers purchase Class Tires out of sheer necessity, with little time to comparison shop and limited information.[7] According to Phillip Kane, a former executive at Goodyear and Pirelli, "Consumers don't really have a frame of reference on what a tire should cost, because you only buy them every few years."[8]

47.     An economist named Bill Wood, who studies the plastics and rubber, explained: "[t]hey can tell you it's going to cost whatever it's going to cost, and as long as it doesn't sound like it's made out of gold, you're going to say, 'OK.'"[9]

48.     While there are many different brands and types of automobile tires, substitution by consumers is limited to the universe of products manufactured by the Defendants. No viable substitute for Class Tires exists. Demand for Class Tires is also more inelastic in the short run. For example, a consumer with a punctured tire is relatively price insensitive. While there may be options within the universe of tire brands and specifications manufactured by the Defendants, there is an immediate need for a replacement tire of some sort.

                    *iii.*         *Opportunities to Collude*

49.     Defendants are members of various trade associations and professional organizations which allow them to facilitate the conspiracy alleged herein. Defendants attend

---

[7] *Id.*
[8] *Id.*
[9] *Id.*

numerous regular events where they have opportunities to communicate with each other in person. Regular and frequent attendance by Defendants' executives at trade association meetings provides ample opportunities to collude.

50.     Each Defendant is a member of the United States Tire Manufacturers Association ("USTMA"), the national trade association for manufacturers of Class Tires in the United States.[10]

51.     Top executives from Defendants are members of the Board of Directors of the USTMA.[11]

52.     The USTMA holds annual conferences and other meetings, giving Defendants ample opportunity to collude.

> iv.     *History of Antitrust Violations*

53.     The tire industry has a history of antitrust violations in the United States.

54.     In October 2011, Bridgestone pleaded guilty and paid a $28 million fine for price fixing and Foreign Corrupt Practices Act violations in the marine hose industry but did not disclose at the time of the plea that it had also participated in an anti-vibration rubber parts conspiracy.[12]

55.     On February 13, 2014, Bridgestone agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in cars sold in the United States and elsewhere.[13]

56.     In 2019, Defendants Bridgestone and Continental were among fifty-two automotive suppliers that paid a total of $23 million in settlements for antitrust law violations brought by the

---

[10] https://www.ustires.org/about-us
[11] *Id.*
[12] https://www.justice.gov/opa/pr/bridgestone-corp-agrees-plead-guilty-price-fixing-automobile-parts-installed-us-cars#:%7E:text=In%20October%202011%2C%20Bridgestone%20pleaded,anti%2Dvibration%20rubber%20parts%20conspiracy.
[13] *Id.*

California Attorney General.[14]

*v.*      *Market Concentration*

57.    The smaller the number of firms in a market, the easier it is for market participants to collude. Defendants controlled virtually all of the U.S. Tire market during the relevant time period, with the top three companies controlling nearly two-thirds of the market.

58.    As of 2022, Goodyear, Michelin, Bridgestone, and Continental accounted for approximately 70% of the entire replacement tire market in the United States.[15] These companies also have subsidiary brands, including: Goodyear (Goodyear, Cooper Tires, Dunlop, and Kelly), Michelin (Michelin, BF Goodrich, and Uniroyal), and Bridgestone (Bridgestone and Firestone).[16] Defendants Hankook and Yokohama each control roughly 4% of the market.[17]

59.    Due to its high market concentration, the U.S. Tire market has the characteristics of an oligopoly.

---

[14] https://www.tyrepress.com/2019/12/tyremakers-among-52-automotive-suppliers-in-us23-million-antitrust-settlement/
[15] https://www.traqline.com/newsroom/blog/the-goliaths-of-the-replacement-tire-industry-are-getting-bigger-how-can-the-davids-compete/
[16] *Id.*
[17] *Id.*



**Tire Market Share**

C.      **Defendants Announced Unprecedented Price Increases During the Relevant Time Period.**

60.      During the relevant time period, pricing of Class Tires has been inconsistent with a competitive market. This pricing behavior, combined with other features of the market, suggests the existence of an illegal conspiracy to fix, raise, maintain, and/or stabilize prices for Class Tires.

61.      From approximately 2011 to 2020, the prices of Class Tires were relatively stable, with only minor fluctuations that occurred gradually over time. By contrast, in the past four years, tire prices surged as a result of frequent, synchronized price hikes by the Defendants. There were at least 65 price announcements for Tires during the relevant time period among Defendants.[18]

62.      On or about February 3, 2020, Sumitomo announced a price increase of up to 5%

---

[18] All of the following price announcements except for Goodyear can be found on the following website: https://www.tirereview.com/tag/price-increase/.

on Falken tires, effective March 1, 2020.

63.     On March 3, 2020, Goodyear announced a price increase of up to 5% on Goodyear and Kelly-brand consumer tires, effective April 1, 2020.[19]

64.     On or about March 12, 2020, Pirelli stated that it would increase prices in the U.S. for tires for cars and light trucks by up to 5% on average, varying by line and tire size, to take effect on April 6, 2020.

65.     On or about October 1, 2020, Bridgestone announced that its "Firestone Truck Bus" and "radial" tire prices would increase between 5% and 8% on November 1, 2020.

66.     On or about October 6, 2020, Yokohama announced a price increase of up to 5% on its consumer tires for high-performance, light truck and passenger vehicle tires sold in the United States to take effect on November 1, 2020.

67.     On or about November 13, 2020, Goodyear announced a 5% increase on Goodyear- and Dunlop-brand consumer tire prices, effective December 1, 2020.[20]

68.     On or about November 13, 2020, Sumitomo announced a price increase on its Falken passenger and light truck and medium truck tires. The medium truck tire increase announced to dealers of up to 6% will have an effective date of December 1, 2020. The passenger and light truck tire increase of up to 8% will have an effective date of January 1, 2021.

69.     On or about December 2, 2020, Bridgestone announced a price increase on all Passenger light truck tires, effective January 1, 2021.

70.     On or about December 3, 2020, Pirelli announced a price increase on car and light truck tires, effective January 1, 2021.

---

[19] https://www.moderntiredealer.com/industry-news/wholesale-distribution/article/11533513/goodyear-will-hike-consumer-tire-prices-2020-03-04
[20] https://www.moderntiredealer.com/topics/industry-news/article/11475914/goodyear-consumer-tire-prices-are-on-their-way-up-2020-11-13

71.     On or about December 22, 2020, Michelin announced a 5% price increase on select Michelin and BF Goodrich passenger and light truck tires, effective February 1, 2021.

72.     On or about January 6, 2021, Continental announced a price increase on select "Continental" and "General" passenger and light truck tires, effective March 1, 2021.

73.     On or about March 1, 2021, Michelin announced a price increase of up to 8% on select Michelin, BF Goodrich, and Uniroyal passenger and light truck tires, effective April 1, 2021.

74.     On or about March 3, 2021, Goodyear announced a price increase of up to 8% on Goodyear, Dunlop and Kelly-brand tires, effective on April 1, 2021.[21]

75.     On or about March 9, 2021, Pirelli announced a price increase of up to 7% on car and light truck tires, effective April 15, 2021.

76.     On or about March 15, 2021, Toyo announced a price increase of up to 6% on consumer and commercial tires, effective May 1, 2021.

77.     On or about March 24, 2021, Bridgestone announced a price increase of up to 8% for select passenger and light truck tires, effective May 1, 2021.

78.     On or about April 1, 2021, Yokohama announced a price increase on all its consumer tires, effective May 1, 2021.

79.     On or about April 1, 2021, Bridgestone announced a price increase of 8% on Firestone brand truck and bus radial tires sold in the U.S. and Canada, effective May 1, 2021.

80.     On or about April 12, 2021, Sumitomo announced a price of up to 8% on Dunlop, Falken and Ohtsu brand passenger, light truck, and medium truck tires and Dunlop motorcycle tires, effective May 1, 2021.

81.     On or about May 3, 2021, Goodyear announced a price increase of up to 8% on

---

[21] https://www.moderntiredealer.com/topics/industry-news/article/11473768/goodyear-to-increase-consumer-tire-prices-2021-03-03

Goodyear, Dunlop, and Kelly-brand consumer tires, effective June 1, 2021.[22]

82.     On or about May 6, 2021, Continental announced a price increase on select "Continental" and "General" passenger and light truck tires, effective July 1, 2021.

83.     On or about May 19, 2021, Michelin announced price increases of up to 6% on select Michelin, BF Goodrich, and Uniroyal passenger and light truck tires, effective July 1, 2021.

84.     On or about May 19, 2021, Pirelli announced a price increase of up to 6% on car and light truck tires, effective July 1, 2021.

85.     On or about June 1, 2021, Bridgestone announced a price increase of up to 8% for select Bridgestone, Firestone, and Fuzion passenger and light truck tires, effective July 1, 2021.

86.     On or about June 14, 2021, Hankook announced a price increase of up to 7% on its passenger car and light truck tires, effective August 1, 2021.

87.     On or about June 15, 2021, Toyo announced a price increase on the dealer base prices across all tire categories of up to 8.5%, effective August 1, 2021.

88.     On or about July 6, 2021, Yokohama announced a price increase on its consumer tires and commercial truck tires, effective August 1, 2021.

89.     On or about July 6, 2021, Sumitomo announced a price increase of up to 8% on Falken and Ohtsu brand passenger, light truck, and medium truck tires, effective August 1, 2021.

90.     On or about August 6, 2021, Goodyear announced a price increase on consumer tires for the fourth time in less than a year, effective September 1, 2021.[23]

91.     On or about August 30, 2021, Continental announced price increases on passenger and light truck tires, effective October 1, 2021.

---

[22] https://www.moderntiredealer.com/topics/industry-news/article/11473768/goodyear-to-increase-consumer-tire-prices-2021-03-03.
[23] https://www.moderntiredealer.com/retail/article/11469453/goodyear-and-cooper-consumer-tire-prices-are-going-up

92.     On or about August 31, 2021, Pirelli announced that it will increase prices up to 8% on passenger car and light truck tires, effective October 2021.

93.     On or about September 10, 2021, Giti announced a price increase, effective October 1, 2021.

94.     On or about September 17, 2021, Hankook announced a price increase of up to 6% on passenger, light truck and commercial truck tires, effective November 1, 2021.

95.     On or about September 21, 2021, Sumitomo announced a price increase of up to 10% on Falken and Ohtsu brand passenger, light truck, and medium truck, effective October 1, 2021.

96.     On or about October 19, 2021, Sumitomo announced a price increase on its Falken medium truck tires, effective December 1, 2021.

97.     On or about October 21, 2021, Yokohama announced a price increase on its consumer replacement tires, effective November 1, 2021.

98.     On or about November 9, 2021, Continental announced a price increase on select passenger and light truck tires, effective January 3, 2022.

99.     On or about December 22, 2021, Sumitomo announced a price increase of up to 8% on Falken, Ohtsu, and private brand passenger and light truck tires, effective January 1, 2022.

100.    On or about December 22, 2021, Toyo announced a price increase on dealer base prices on passenger car, light truck, and commercial truck tire patterns of up to 10%, effective February 1, 2022.

101.    On or about December 28, 2021, Michelin announced a price increase of up to 12% on select Michelin, BF Goodrich, and Uniroyal passenger and light truck tires, effective January 1, 2022.

102.     On or about January 1, 2022, Goodyear announced price increases of up to 12% on consumer and up to 14% on commercial/OTR (Off the Road) tires across all brands.[24]

103.     On or about January 3, 2022, Pirelli announced a price increase of up to 10% on car and light truck tires, effective January 17, 2022.

104.     On or about January 4, 2022, Giti announced price increases on all Giti-produced passenger and light truck and TBR (Truck, Bus, and Radial), tires of up to 10%, starting in January 2022.

105.     On or about January 10, 2022, Yokohama announced a price increase on its consumer tires and commercial trucks, effective February 1, 2022.

106.     On or about January 12, 2022, Bridgestone announced a price increase of up to 14% on Bridgestone and Firestone truck and TBR tires, effective February 1, 2022.

107.     On or about February 7, 2022, Michelin announced price increases of up to 5% on select Michelin, BF Goodrich, and Uniroyal passenger and light truck winter tires, effective April 1, 2022.

108.     On or about February 21, 2022, Sumitomo announced price increases on Falken and Ohtsu brand passenger car, light truck, and medium truck tires, effective March 1, 2022.

109.     On or about March 1, 2022, Continental announced price increases on select Continental passenger and light truck tires, effective April 1, 2022.

110.     On or about March 2, 2022, Bridgestone announced price increases of up to 10% on non-winter Bridgestone, Firestone, and Fuzion passenger and light truck tires, effective April 1, 2022.

111.     On or about March 23, 2022, Pirelli announced price increases of up to 10% for its

---

[24] https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1

car and light truck tires, effective April 11, 2022.

112.    On or about March 24, 2022, Giti announced that price increases on all Giti produced Passenger and light truck, and TBR tires of up to 8%, starting in May 2022.

113.    On or about April 1, 2022, Hankook announced a price increase on Hankook and Laufenn brand passenger and light truck products of up to 8%, effective May 1, 2022.

114.    On or about May 11, 2022, Michelin announced price increases across its brands ranging from 5-12% on the majority of passenger, light truck, and motorcycle tires and service of up to 9%, effective June 1, 2022.

115.    On or about May 17, 2022, Pirelli announced price increases of up to 10% for car and light truck tires, effective on June 15, 2022.

116.    On or about May 24, 2022, Yokohama announced a price increase on its consumer tires and commercial truck tires, effective July 1, 2022.

117.    On or about June 6, 2022, Bridgestone announced price increases of up to 10% across its portfolio of consumer tires, effective July 1, 2022.

118.    On or about June 10, 2022, Sumitomo announced price increases on Falken-brand passenger, light truck and medium truck products, effective July 1, 2022.

119.    On or about June 15, 2022, Goodyear announced price increases for all Goodyear- and Cooper-brand consumer tires of up to 10%, and on commercial truck tires by up to 6%, effective July 1, 2022.[25]

120.    On or about June 27, 2022, Toyo announced that it would increase the dealer base prices on select passenger car, light truck, and commercial tire patterns of up to 5%, effective August 1, 2022.

---

[25] https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1

121.    On or about September 8, 2022, Bridgestone announced a price increase for consumer and commercial tires, effective October 1, 2022.

122.    On or about December 12, 2022, Pirelli announced price increases of up to 10% for car and light truck tires, effective January 15, 2022.

123.    On or about December 13, 2022, Bridgestone price increases for Bridgestone, Firestone, and Fuzion passenger and light truck tires, effective January 1, 2023.

124.    On or about December 13, 2022, Michelin announced price increases across its brands by up to 9% on select passenger and light truck tires, effective January 1, 2023.

125.    On or about April 7, 2023, Sumitomo announced price increases on Falken brand passenger, light truck, and medium truck tires of up to 7%, effective May 1, 2023.

126.    On or about October 9, 2023, Sumitomo announced price increases of up to 6% on select Falken passenger and light trucks, effective November 1, 2023.

127.    All of the Defendants cited raw-materials and other inflation-impacted costs for the need to raise prices throughout the relevant time period.[26]

128.    Goodyear, however, admitted that the increase in prices for Class Tires exceeded any increase in manufacturing costs. On May 6, 2022, Goodyear's Chief Financial Officer, Darren Wells, stated that "our increase in the replacement tire prices more than offset our costs," and reiterated that point several times throughout the call. He went on to state, "[n]ow with the recent announcements that have been made, I think we feel like our competitors are catching up."[27]

129.    From May 2021 to May 2023, the average price of Class Tires rose 21.4%, more than 70% higher than core inflation.[28] As the economy slowed in 2023, many of the costs that

---

[26] *See e.g.,* https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1
[27] https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call
[28] https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices

drove inflation dissipated, yet Defendants believed they could maintain higher prices and in fact did so.[29]

130.    Absent an agreement to fix prices, Defendants would have competed over market share by undercutting each other's prices rather than implementing lockstep price increases.

### D.    Defendants Signaled to Each Other That Pricing Would Remain High and Monitored Competitor Price Announcements.

131.    On November 5, 2021, Goodyear's CEO Rich Kramer stated during an earnings call with investors: "So we monitor all those tire manufacturers that are out there. And what we've seen that they've all announced at least three price increases this year . . ."[30]

132.    On February 11, 2021, Mr. Kramer stated on another earnings call: "It's a really very, very good constructive pricing environment that we've seen right now, probably the best in recent memory . . . If we could make more, we can actually even sell more in the environment that we're seeing."[31]

133.    Darren Wells, Goodyear's CFO, stated on a Q4 2021 earnings call: "There are nine competitors that we tend to track and seven out of the nine have announced price increases in the first quarter. And one of the ones who hadn't raised prices right at the end of last year, so we are seeing very consistent pricing across all the significant industry players."[32]

134.    On a Q3 2022 earnings call, when asked by an analyst, "can you just maybe give us some color on what you're seeing with regard to price discipline? Do you think that the industry is going to kind of take the tack [sic] of trying to support pricing and in order to compensate for inflation?" Goodyear CEO Kramer answered: "So I would say, yes, I think that there is an

---

[29] *Id.*
[30] https://seekingalpha.com/article/4466211-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q3-2021-results-earnings-call
[31] *Id.*
[32] *Id.*

acknowledgment of what price and mix has to do in the marketplace to deal with the environment we're in."[33]

135.    During a Q1 2022 earnings call, Continental CFO Katja Dürrfeld refenced sustainable pricing several times, including: "[t]o mitigate the broad inflationary headwinds, implementation of sustainable pricing is mandatory."[34]

136.    In 2022, Toyo CEO Michael Graber stated that "[p]rice increases have been a necessary counteraction to increased costs in raw materials, logistics and labor for Tokyo and everyone else in the industry."[35]

137.    On June 17, 2022, Nokian announced that it had "succeeded in implementing price increases to mitigate cost inflation."[36]

138.    The frequency of Defendants' price announcements and public signaling and the coordinated nature of the price hikes, such as the effective date and the specific products affected, ensured that the conspiracy would be effective.

139.    As a result of Defendants' unlawful conduct, Plaintiff and members of the Class paid higher prices for Class Tires sold by Defendants than they would have in a competitive market.

## TOLLING OF THE STATUTES OF LIMITATION

140.    Claims of members of the Classes who purchased tires within four years prior to

---

[33] https://seekingalpha.com/article/4551459-goodyear-tire-and-rubber-co-gt-q3-2022-earnings-call-transcript
[34] https://seekingalpha.com/article/4510196-continental-aktiengesellschafts-cttaf-management-on-q1-2022-results-earnings-call-transcript
[35] https://www.tirebusiness.com/news/rising-tire-prices-affected-several-factors
[36] https://www.reuters.com/business/autos-transportation/finlands-nokian-tyres-lifts-sales-outlook-despite-russia-uncertainty-2022-06-17/#:%7E:text=%22However%2C%20tire%20demand%20has%20remained,it%20said%20in%20a%20st atement.

the filing of this Complaint are not barred by the applicable four-year statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

141.     Plaintiff and other members of the Classes did not know and could not have known of Defendants' illegal conduct until the European Commission announced inspections in the tire industry on January 30, 2024. Before then, Plaintiff and other members of the Classes had no reason to believe that they paid prices for tires that were affected by Defendants' illegal conduct, and thus had no duty until then to investigate the claims set forth in this Complaint. Defendants' secret price-fixing agreements were inherently self-concealing.

142.     Additionally, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct. For example, Michelin attributed its 12% price increase on passenger and light truck replacement tires in 2022 to "market dynamics."[37] Goodyear justified its July 1, 2022 price increase on consumer tires to rising raw-materials and other inflation-impacted costs.[38] Pirelli justified its April 11, 2022 price increase to "changing market conditions."[39]

143.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four-year statute of limitations governing claims under the Sherman Act was tolled at least until January 30, 2024, pursuant to the injury- discovery rule and the doctrine of fraudulent concealment.

## CLASS ALLEGATIONS

144.     Pursuant to Federal Rules 23(a) and (b)(2), Plaintiff brings this action on her own behalf and on behalf of a nationwide class (the "Nationwide Class"), defined as follows:

**The Nationwide Class:** All persons or entities who purchased replacement tires indirectly, for use and not resale, from one or more of the Defendants within a state or territory of the

---

[37] https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across-passenger-brands-and-commercial-offers-in-north-american-market-301435108.html
[38] https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1
[39] https://www.tirereview.com/pirelli-increases-price-for-tires/

24

United States during the applicable limitations period.

145.    Pursuant to Federal Rules 23(a) and (b)(3), Plaintiff brings this action on her own

behalf and on behalf of a multi-state class seeking monetary damages defined as follows:

> **The Damages Class:** All persons or entities who purchased replacement tires
> indirectly, for use and not resale, from one or more of the Defendants within a state
> or territory of the United States whose laws permit an indirect purchaser to pursue
> a claim for anticompetitive conduct within the applicable limitations period.

146.    Excluded from the Classes are any members of the judiciary assigned to preside

over this matter, their staff, and any of their immediate family members; any officer or director of

Defendants and any immediate family member of such officers or directors; and Plaintiff's and

Defendants' counsel.

147.    Upon information and belief, there are hundreds of thousands of members of the

Classes, making the members of the Classes so numerous that joinder of all members is

impracticable. Although the exact number of members of the Classes is currently unknown to

Plaintiff, the members can be easily identified through Defendants' records and the records of

retailers who sold Class Tires.

148.    Plaintiff's claims are typical of the claims of the members of the Classes Plaintiff

seeks to represent, because the factual and legal bases of Defendants' liability to Plaintiff and the

other members of the Classes are the same, and because Defendants' conduct has resulted in

similar injuries to Plaintiff and to the members of the Classes. As alleged herein, Plaintiff and the

other members of the Classes have all suffered injuries as a result of Defendants' antitrust

violations.

149.    There are many questions of law and fact common to the claims of Plaintiff and the

other members of the Classes, and those questions predominate over any questions that may affect

individual members of the Classes. Common questions for the Classes include, but are not limited

to, the following:

(a)     Whether Defendants contracted, combined, or conspired with one another to restrain the trade of tires at any time during the relevant time period;

(b)     Whether Defendants' conduct caused the prices of tires sold directly to wholesalers, retailers, and consumers to be higher than the competitive level as a result of their restraint of trade;

(c)     Whether Plaintiff and the other members of the Classes were injured by Defendants' conduct and, if so, the determination of the appropriate classwide measure of damages; and

(d)     Whether Plaintiff and other members of the Classes are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

150.     Absent a class action, most members of the Classes would find the cost of litigating their claims to be prohibitively expensive and would thus have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions in that it conserves the resources of the courts and the litigants and promotes consistency of adjudication.

151.     Plaintiff will adequately represent and protect the interests of the members of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes and have the financial resources to do so. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Classes.

152.     Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Classes, requiring the Court's imposition of uniform relief to ensure

compatible standards of conduct toward the members of the Classes and making injunctive or corresponding declaratory relief appropriate for the Classes as a whole.

<u>COUNT I</u>
**Violation of The Sherman Act 15 U.S.C. § 1**
**(On behalf of Plaintiff and the Nationwide Class)**

153.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

154.    Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), by artificially restraining competition with respect to the price of new replacement tires for passenger cars, vans, trucks and buses sold within the United States, with the purpose and effect of raising prices.

155.    Defendants' agreements are transactions in interstate commerce, as are the replacement tires themselves, which are delivered using, and themselves constitute, instrumentalities of interstate commerce.

156.    Defendants collectively control over 64% of the new replacement tires market.

157.    Defendants' agreements are together and individually per se violations of Section 1 of the Sherman Act. This is in part because the primary objective of the agreements is to force prices in the new replacement tires market to increase, maintain or stabilize at levels above what would have occurred in a competitive market. In fact, because Defendants achieved that objective, the prices for new replacement tires have increased 21.4% in the last few years.

158.    This injury, along with others alleged in this Complaint, constitutes the types of injury that the antitrust laws were intended to prevent. Plaintiff and the Nationwide Class members have suffered and will continue to suffer these injuries, including paying an anticompetitive

overcharge for new replacement tires, as a result of Defendants' anticompetitive agreements. Plaintiff and the Nationwide Class members have been and will be injured by Defendants' violations of Section 1 of the Sherman Act.

159.    Defendants are recidivists, and continue to assert that their conduct was legitimate. The fact that the conduct alleged may have ceased at some point does not mean that Defendants will not engage in similar types of price-fixing in the future.

160.    For this conduct, Plaintiff and members of the proposed Classes are entitled to injunctive relief and attorneys' fees and costs under 15 U.S.C. § 26.

**COUNT II**
**Violation of State Antitrust Statutes**
**(On behalf of Plaintiff and the Damages Class)**

161.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

162.    During the relevant time period, Defendants entered into contracts, combinations, or conspiracies with one another as alleged above, for the purpose and with the effect of artificially raising prices of replacement tires.

163.    The contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for tires, including in the United States.

164.    In formulating and effectuating this conspiracy, Defendants performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of tires purchased by Plaintiff and members of the Damages Class.

165.    Defendants engaged in the actions described above for the purpose of carrying out

their unlawful agreements to fix, increase, maintain, or stabilize prices of tires. As a direct and proximate result, Plaintiff and members of the Damages Class were deprived of free and open competition and paid more for tires than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the states included herein were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

166.    Accordingly, Plaintiff and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws. Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

167.    Arizona: Defendants have entered into unlawful agreements in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq.* Defendants' conspiracies had the following effects in Arizona: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

168.    California: Defendants entered into unlawful agreements in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq.* During the relevant time period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce

described above in violation of Cal. Bus. & Prof. Code § 16720. Each Defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, stabilize, and maintain prices of tires at supracompetitive levels. The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of tires. For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of tires. The combination and conspiracy alleged herein have had, inter alia, the following effects in California: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. In accordance with Cal. Bus. & Prof. Code § 16750, Plaintiff seeks monetary relief three times the total damage sustained by all injured persons and their property, the interest on the total damages allowed under Cal. Bus. & Prof. Code § 16761, and the costs of suit, including reasonable attorneys' fees.

169. Connecticut: Defendants have entered into unlawful agreements in restraint of trade in violation of Conn. Gen. Stat. Ann. § 35-24, *et seq*. Defendants' conspiracies had the following effects in Colorado: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Connecticut commerce.

Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. § 35-24, *et seq.*

170.    District of Columbia: Defendants have entered into unlawful agreements in restraint of trade in violation of D.C. Code § 28-4501, *et seq*. Defendants' combinations or conspiracies had the following effects in the District of Columbia: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code § 28-4501, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under D.C. Code § 28-4501, *et seq.*

171.    Hawaii: Defendants have entered into unlawful agreements in restraint of trade in violation of Haw. Rev. Stat. Ann. § 480-1, *et seq*. Defendants' conspiracies had the following effects in Hawaii: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Hawaiian commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Haw. Rev. Stat. Ann. § 480-1, *et seq.*

172.    Illinois: Defendants have entered into unlawful agreements in restraint of trade in

violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. The Defendants'
combinations or conspiracies had the following effects in Illinois: (1) price competition for tires
was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and
stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived
of free and open competition; and (4) Plaintiff and members of the Damages Class paid
supracompetitive, artificially inflated prices for tires. By reason of the foregoing, Defendants have
entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et
seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available
under 740 Illinois Compiled Statutes 10/1, *et seq.*

173.    Iowa: Defendants have entered into unlawful agreements in restraint of trade in
violation of Iowa Code § 553.1, *et seq*. Defendants' combinations or conspiracies had the
following effects in Iowa: (1) price competition for tires was restrained, suppressed, and
eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels;
(3) Plaintiff and members of the Damages Class were deprived of free and open competition; and
(4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices
for tires. During the relevant time period, Defendants' illegal conduct substantially affected Iowa
commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of
trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiff and members of the Damages
Class seek all forms of relief available under Iowa Code § 553.1, *et seq.*

174.    Kansas: Defendants have entered into unlawful agreements in restraint of trade in
violation of Kan. Stat. § 50-101, *et seq*. Defendants' combinations or conspiracies had the
following effects in Kansas: (1) price competition for tires was restrained, suppressed, and
eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels;

(3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. § 50-101, *et seq.*

175.    Maine: Defendants have entered into unlawful agreements in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects in Maine: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

176.    Maryland: Defendants have entered into unlawful agreements in restraint of trade in violation of Md. Code Ann., Com. Law § 11-201, *et seq.* Defendants' combinations or conspiracies had the following effects in Maryland: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Maryland commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Md. Code Ann., Com. Law § 11-201, *et seq.*

177. Michigan: Defendants have entered into unlawful agreements in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq*. Defendants' combinations or conspiracies had the following effects in Michigan: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws § 445.771, *et seq*.

178. Minnesota: Defendants have entered into unlawful agreements in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects in Minnesota: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minn. Stat. § 325D.49, *et seq*.

179. Mississippi: Defendants have entered into unlawful agreements in restraint of trade in violation of Miss. Code § 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects in Mississippi: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Miss. Code § 75-21-1, *et seq.*

180.    Nebraska: Defendants have entered into unlawful agreements in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq.* Defendants' combinations or conspiracies had the following effects in Nebraska: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. § 59-801, *et seq.*

181.    Nevada: Defendants have entered into unlawful agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq.* Defendants' combinations or conspiracies had the following effects in Nevada: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

182.    New Hampshire: Defendants have entered into unlawful agreements in restraint of

trade in violation of New Hampshire Revised Statutes Ann. § 356:1, *et seq*. Defendants' combinations or conspiracies had the following effects in New Hampshire: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq.*

183. New Mexico: Defendants have entered into unlawful agreements in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects in New Mexico: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq.*

184. New York: Defendants have entered into unlawful agreements in restraint of trade in violation of New York General Business Laws § 340, *et seq*. Defendants' combinations or conspiracies had the following effects in New York: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and

open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq.*

185.    North Carolina: Defendants have entered into unlawful agreements in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects in North Carolina: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq.*

186.    North Dakota: Defendants have entered into unlawful agreements in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.* Defendants' combinations or conspiracies had the following effects in North Dakota: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code § 51-08.1-01, *et seq.*

187. Oregon: Defendants have entered into unlawful agreements in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq*. Defendants' combinations or conspiracies had the following effects in Oregon: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq.*

188. Rhode Island: Defendants have entered into unlawful agreements in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq*. The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the relevant time period. Defendants' combinations or conspiracies had the following effects in Rhode Island: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws § 6 36-11, *et seq.*

189. South Dakota: Defendants have entered into unlawful agreements in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects in South Dakota: (1) price competition for tires was

restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37 1-3.1, *et seq.*

190.    Tennessee: Defendants have entered into unlawful agreements in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects in Tennessee: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. § 47-25-101, *et seq.*

191.    Utah: Defendants have entered into unlawful agreements in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combinations or conspiracies had the following effects in Utah: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available

under Utah Code Annotated § 76-10-3101, *et seq.*

192. Vermont: Defendants have entered into unlawful agreements in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq.* Defendants' combinations or conspiracies had the following effects in Vermont: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann.§ 2465, *et seq.*

193. West Virginia: Defendants have entered into unlawful agreements in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq.* Defendants' combinations or conspiracies had the following effects in West Virginia: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, *et seq.*

194. Wisconsin: Defendants have entered into unlawful agreements in restraint of trade in violation of Wis. Stat. § 133.01, *et seq.* Defendants' combinations or conspiracies had the following effects in Wisconsin: (1) price competition for tires was restrained, suppressed, and eliminated; (2) tire prices were raised, fixed, maintained, and stabilized at artificially high levels;

(3) Plaintiff and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for tires. During the relevant time period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wis. Stat. § 133.01, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the other members of the Classes, prays for the following relief:

1. An order certifying the Classes as defined above;

2. For all forms of relief set forth above;

3. An order enjoining Defendants from continuing to engage in the unlawful conduct and practices described herein;

4. An award of attorney's fees and costs;

5. Award such further relief as the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

DATED: May 30, 2024                    Respectfully submitted,

                                       ANGELA MCMILLER, individually and on behalf
                                       of similarly situated individuals

                                       By: /s/ *Paul T. Geske*
                                       One of Plaintiff's Attorneys

                                       Myles McGuire
                                       Paul T. Geske
                                       Jordan R. Frysinger
                                       McGuire Law, P.C.
                                       55 W. Wacker Drive, 9th Floor
                                       Chicago, IL 60601

Tel: (312) 893-7002
mmcguire@mcgpc.com
pgeske@mcgpc.com
jfrysinger@mcgpc.com

*Attorneys for Plaintiff and the Putative Classes*